[No. 126-40898-3.    Division Three.    October 7, 1970.]

C. C. DILL, *Appellant*, v. PUBLIC UTILITY DISTRICT No. 2 OF GRANT COUNTY, *Respondent*.

*William G. Ennis* and *Jerome Williams*, for appellant.

*Robert A. Milne* (of *Milne & Peterson*), for respondent.

GREEN, J.—Plaintiff, C. C. Dill, brought this action to recover $9,415 allegedly due under a contingent fee contract entered into with Public Utility District No. 2 of

Grant County, defendant. Plaintiff appeals (1) an order granting defendant's motion for summary judgment and dismissing the action with prejudice; and (2) an order denying plaintiff's motion for change of venue.

On August 22, 1957, plaintiff, a lawyer and former United States Congressman and Senator, entered into a letter agreement[1] with defendant to perform services in attempt-

---

[1] "Law Offices
of
Clarence C. Dill
Hutton Building
Spokane 4, Washington
August 22, 1957

"To PUBLIC UTILITY DISTRICT COMMISSIONERS
OF GRANT COUNTY, WASHINGTON,
Ephrata, Washington

"Gentlemen:

"In connection with my efforts to bring about the storage of flood waters of the Columbia River in British Columbia which will be released each year during the low water months to produce power at the down river dams in the United States, including your dams at Priest Rapids and Wanapum, I make the following proposal for a contingent fee for my services in working on this matter, as follows:

"In consideration of the work I have done and shall do to bring about the storage of water in British Columbia on the upper Columbia River to be released during the low water season each year to provide additional power at the Priest Rapids and Wanapum dams and payment by me of all my own expenses and the expenses of co-counsel I may secure in British Columbia or the United States and engineers and others whom I may consult and use, I propose that you shall pay me a contingent fee of one-tenth of a mill per kilowatt hour for each kilowatt hour of energy you sell which is produced at Priest Rapids and Wanapum dams during one low water season by Canadian storage water. Provided that if an agreement has been made with the builder and/or owner of Canadian storage by the District and the dam or dams are under construction, said contingent fee shall be paid to my heirs or assigns in case I shall die previous to the actual release of said storage water.

"After payment of the contingent fee of one-tenth of a mill per kilowatt hour of energy on power produced and sold as aforesaid for one year, I propose that I act as consultant and adviser to the District on all matters relating to storage in British Columbia for five years, for which you are to pay me a fee of one-twenty-fifth of a mill per kilowatt hour of energy you sell which is produced by British Columbia storage at Priest Rapids and Wanapum dams each year, it being understood that you will pay the contingent fee of one-tenth of a mill per kilowatt hour only once on power sold as produced from any particular amount of

ing to bring about the storage of Columbia River water in British Columbia. The purpose of such storage was to increase production of power at Priest Rapids and Wanapum dams during the low water season when stored water could be released into the Columbia River from Canada. If plain-

---

British Columbia storage. To clarify this paragraph, let me add that whenever the amount of British Columbia storage used in a low water season exceeds the total amount of storage previously used in any one low water season, the rate of one-tenth of a mill per kilowatt hour shall apply only to the excess for that year, and thereafter the rate of one-twenty-fifth of a mill shall apply. All payments shall be made from the revenues from the Priest Rapids Project and not from the revenues of the District's distribution system.

"I agree to carry forward promptly and continuously negotiations for the purpose of securing at as early a date as possible an agreement with the officials of the government of British Columbia, or an organization in British Columbia empowered to construct and operate storage dams in the Columbia river above the Canadian border, for the release of storage water to produce power at the dams and power plants below the border during the period of low water flow in the river. I agree further to report to the Manager and the Commissioners, from time to time, the progress of the negotiations, and if and when a proposed agreement is reached, to submit it at once to the Commissioners for acceptance, modification or rejection.

"No other compensation is to be paid to me by you and if by January 1, 1968, no agreement has been made by you for use of storage from the upper Columbia in British Columbia or no storage dam is under construction by January 1, 1968, to make storage available from the upper Columbia under your agreement, no compensation whatever shall be paid to me. The duration of this agreement shall be from date of acceptance of this proposal to January 1, 1968.

"Acceptance of this proposal by passage of a resolution authorizing the signing of the acceptance of this proposal and signature on this letter will constitute the entire contract and agreement between the District and me.

"Respectfully submitted,

s/ Clarence C. Dill
Clarence C. Dill

"Accepted this 3rd day of October, 1957:
s/ F. W. Arlt
President
s/ Geo. Schuster
Commissioner
Attest:
s/ W. M. Schempp
Secretary"

tiff was successful in bringing this about, he was to be paid a contingent fee.

The record shows that between 1940 and 1957, plaintiff, acting on his own and employed by no one, performed substantial work in pursuit of this goal. He contacted high-level officials in British Columbia, Washington D.C. and the northwestern states as well as members of the Canadian-American International Joint Commission. Following the execution of the letter agreement, Mr. Dill continued these efforts.

Prior to April 12, 1960, Mr. Dill notified defendant he desired to appear before defendant's commissioners on April 25, 1960 to explain the current status of the water storage problem. On April 12, 1960, attorney Darrel E. Ries, at defendant's direction, notified Mr. Dill by registered mail that he was not authorized to represent defendant on this or any other matter. Thereafter, Mr. Dill did no further work. Subsequent thereto, a treaty was consummated between the United States and Canada and funds were raised for construction of Canadian dams. It is clear Mr. Dill at no time attended any meetings of the joint commission nor participated in the drafting of treaty agreements or any other documents.

Plaintiff's complaint alleges water was first stored in Canada by means of Canadian dam construction during the spring of 1967 and water was first available for production of energy at defendant's Priest Rapids and Wanapum dams during the period August 1, 1967 to April 1, 1968; that on April 1, 1968, compensation at the rate of one-tenth of a mill for 94,150,000 kilowatt hours of energy became due and owing or the sum of $9,415; and that on June 19, 1968 a claim was presented to defendant for this amount and rejected on July 5, 1968. This action was then commenced. Defendant moved for summary judgment upon the pleadings, the deposition of Mr. Dill and defendant's affidavit. In granting the motion, the trial judge said:

> I think if Mr. Dill had a cause of action, he had a cause of action in 1960 when he was discharged, and he could have brought an action on a quantum meruit basis for

work performed, and I think he waited too long in bringing his action.

Plaintiff contends this conclusion was erroneous.

Plaintiff takes the position the letter of August 22, 1957 was a bilateral contract; his performance under that contract was completed prior to termination on April 12, 1960; defendant's performance was not required until April 1, 1968 and a breach of the contract by defendant did not occur until that date; the letter of April 12, 1960 was at most an anticipatory breach that plaintiff could elect to ignore; and the statute of limitations on plaintiff's cause of action for defendant's breach accrued April 1, 1968 when plaintiff's demand for payment was rejected. In support of this position, plaintiff cites Restatement of Contracts, § 322 (1932); *Boyer v. Yakima,* 156 Wash. 518, 287 P. 211 (1930); 17 Am. Jur. 2d *Contracts* § 457; and *Burke & Farrar, Inc. v. Campbell,* 128 Wash. 646, 224 P. 9 (1924).

■ It has long been the rule in our state that a client has the right, with or without cause, to discharge his attorney at any time; upon such discharge the attorney is relegated to the remedy of a judgment against his client in quantum meruit for the reasonable value of his services rendered to the time of discharge. *Hamlin v. Case & Case, Inc.,* 188 Wash. 150, 153, 61 P.2d 1287 (1936); *Kimball v. PUD 1,* 64 Wn.2d 252, 257, 391 P.2d 205 (1964); *Cavers v. Old Nat'l Bank & Union Trust Co.,* 166 Wash. 449, 452, 7 P.2d 23 (1932); *Ramey v. Graves,* 112 Wash. 88, 191 P. 801 (1920). In *Hamlin,* 188 Wash. at 154-55, it was stated:

> The rule is general here, and elsewhere, that, where the compensation of an attorney is to be paid to him contingently on the successful prosecution of a suit and he is discharged or prevented from performing the service, the measure of damages is not the contingent fee agreed upon, but reasonable compensation for the services rendered, and
>
> "If the compensation agreed upon is contingent on the successful result of the suit, the measure of damages is not the contingent fee but the reasonable value of the services rendered." *Ramey v. Graves,* 112 Wash. 88, 191 Pac. 801, citing many cases.
>
> . . .

This court has also reaffirmed the same principle announced in the *Ramey* case, *supra*, in *Wright v. Johanson*, 132 Wash. 682, 233 Pac. 16, and *Cavers v. Old Nat. Bank & Union Trust Co.*, 166 Wash. 449, 7 P. (2d) 23.

As early as 1925 it was held that such cause of action by an attorney arises on the date of discharge and the statute of limitations begins to run on that date. *Wright v. Johanson*, 132 Wash. 682, 233 P. 16 (1925); see *Martin v. Camp*, 219 N.Y. 170, 114 N.E. 46 (1916). These rules have been applied in cases where the discharge occurred before the attorney fully performed his agreement. In this situation, the usual contract rules on anticipatory breach have not been applied.

However, it is Mr. Dill's position that when the alleged discharge occurred he had fully performed his agreement with defendant, leaving nothing further for him to do except await the happening of the contingency and, if it happened, receive his fee. If Mr. Dill could prove such full performance prior to defendant's letter of April 12, 1960, then the letter purporting to discharge him must be regarded as merely notice that defendant did not intend to pay. It is clear that one party cannot discharge the other from his obligation to perform where such performance has been completed. It comes too late. To hold otherwise would deny the performing party the fruits of his agreement. *Beck v. Boucher*, 114 Wash. 574, 195 P. 996 (1921); *Cf. Cavers v. Old Nat'l Bank*, *supra*, at 452; *Ramey v. Graves*, *supra*, at 92. Assuming Mr. Dill's contentions can be supported, defendant's breach, if any, of its agreement with Mr. Dill occurred when it refused to pay the contingent fee in 1968 as required by the agreement, rather than on April 12, 1960. Mr. Dill's action commenced in August 1968 would be timely. RCW 4.16.040.

A motion for summary judgment is properly granted *only* if there is no genuine issue of fact as to any material element necessary to support the claimed cause of action. *Felsman v. Kessler*, 2 Wn. App. 493, 468 P.2d 691 (1970); *Clarkston Community Corp. v. Asotin County Port Dist.*, 3 Wn.

App. 1, 472 P.2d 558 (1970). Considering the record in a light most favorable to the losing party, an issue of fact was created as to whether or not on April 12, 1960 Mr. Dill had fully performed everything required by his agreement. Accordingly, the order granting summary judgment and dismissal is reversed and remanded for trial.

If upon trial the trier of fact should determine that Mr. Dill did not fully perform the agreement with defendant prior to the alleged discharge on April 12, 1960, then the statute of limitations began running on Mr. Dill's claim on that date and the complaint having been filed more than 6 years thereafter is not timely and should be dismissed with prejudice.

Mr. Dill also contends the trial court erred when it failed to grant his motion for change of venue. The granting or denial of a change of venue or transfer of the cause to another county rests in the sound discretion of the trial judge. *Kimball v. PUD 1, supra; Russell v. Marenakos Logging Co.*, 61 Wn.2d 761, 380 P.2d 744 (1963). The motion for change of venue filed December 11, 1968 was predicated on two newspaper articles in the Grant County Journal in 1965 and the claim by affidavit that defendant had received such publicity in past years that an impartial jury could not be selected from residents of Grant County who are defendant's customers. Having in mind the lapse of years involved in this case, both with respect to the subject matter of this action and the newspaper publications, as well as the trial judge's familiarity with the Grant County situation, we cannot hold there was an abuse of judicial discretion in denying the change of venue. By our holding, we do not foreclose the trial judge from reconsidering the question upon a showing of current prejudice.

Judgment remanded for further proceedings in accordance with this opinion.

EVANS, C. J., and MUNSON, J., concur.

Petition for rehearing denied November 13, 1970.

Review denied by Supreme Court December 21, 1970.